Joshua Wagner
Adam Kwasman
Wagner & Kwasman, PLLC
4643 N. 24th St.
Phoenix, Arizona 85016
Telephone: (602) 698-8900
Facsimile: (844) 205-7471
jwagner@wagnerandkwasman.com

William B. Blaser (AZ Bar No. 004684)
1745 East Glenn Street, #227
Tucson, AZ 85719
Telephone: (520) 529-0123
williambblaser@gmail.com

C. Lincoln Combs (AZ Bar No. 025080)
Matthew P. MacLeod (AZ Bar No. 022573)
GALLAGHER & KENNEDY, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
Tel: (602) 530-8000
Fax: (602) 530-8500
Lincoln.combs@gknet.com
Matt.macleod@gknet.com

*Attorneys for the Plaintiff*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Jason Pearson, an individual,<br><br>Plaintiff,<br><br>v.<br><br>CoreCivic, Inc., a Maryland corporation, d/b/a CoreCivic, Corrections Corporation of America, and CCA; CoreCivic of Tennessee, LLC, a Tennessee limited liability company, d/b/a CCA of Tennessee; Christopher Lewis and Jane Doe Lewis, a married couple; Christobal Carrizoza and | Case No. 2:20-cv-00237-MTL<br><br>**AMENDED COMPLAINT** |

1

Jane Doe Carrizoza, a married couple; and Julian Nunez and Jane Doe Nunez, a married couple,

Defendants.

## **SUMMARY OF THE CASE**

1.     Three supervising officers at a private prison agreed to intentionally shoot, and did, in fact, intentionally shoot Plaintiff, a subordinate corrections officer, inflicting severe, permanent, life-threatening injuries.  Approximately fifteen co-workers witnessed the shooting.

2.     Plaintiff was an up-and-coming, educated, fit, hard-working, new trainee who Defendants considered "cocky" who "needed to be taken down a peg."

3.     At least one perpetrator admitted to shooting Plaintiff with a 37mm Muzz Tactical Launcher loaded with a MuzzleBlaster roundleBlaster at close range.

4.     An internal investigation by CoreCivic following the incident confirmed the sum and substance of the attack as alleged herein.

5.     The three Supervisors, Defendants Lewis, Nunez, and Carrizoza, have all admitted in their pleadings in this matter that they were in the course and scope of their employment when the acts complained of herein occurred.

6.     This case seeks just compensation for the misconduct of Defendants, a private prison and its personnel.

## **JURISDICTION AND VENUE**

7.     This Court has jurisdiction over this action pursuant to Article 6, § 14 of the Arizona Constitution and A.R.S. §§ 12-123 and 12-1801, *et seq.*

8.     Venue for this action lies in Pinal County pursuant to A.R.S. § 12-401(7) and (10) because at least one Defendant resides in that county and because the actions and offenses giving rise to the Plaintiff's claims for damages were committed in that county.

## **PARTIES**

9.     Plaintiff Jason Pearson, an individual, is a citizen of the United States and a resident of Arizona.

10. Jason was a relatively new employee at the Red Rock Correctional Center in Eloy, Arizona ("Red Rock Prison") on or about November 23, 2018.

11. CoreCivic, Inc. is a publicly traded corporation organized under the laws of Maryland and was previously known as the Corrections Corporation of America or CCA. It owns and operates private prisons and halfway houses throughout the United States. One of those facilities is the Red Rock Prison; CoreCivic owns the facility and incarcerates inmates as a private contractor of the Arizona Department of Corrections.

12. CoreCivic of Tennessee, LLC ("CCT") is a wholly-owned subsidiary of CoreCivic, which contracts with CoreCivic to provide substantially all the correctional, detention, and residential reentry services that CoreCivic provides to governmental agencies. On information and belief, CCT operates the Red Rock Prison.

13. CoreCivic, Inc. and CCT are referred to collectively herein as "CoreCivic."

14. Neither CoreCivic nor any its affiliates is a "public entity" within the meaning of A.R.S. § 12-820(7) because it is not the State of Arizona or an agency, board, commission, department, or political subdivision of the State of Arizona.

15. Personnel of CoreCivic and of CoreCivic's affiliates are not employees of a "public entity," within the meaning of A.R.S. § 12-820(6).

16. At all times relevant to this Complaint, Christopher Lewis was a sergeant at the Red Rock Prison, the Commander of the Tactical Support Unit, and one of the Plaintiff's commanding officers.

17. Upon information and belief, Defendants Christopher Lewis and Jane Doe Lewis were at all times relevant to this Complaint and are currently residents of Arizona.

18. At all times relevant to this Complaint, Christobal Carrizoza was a sergeant at the Red Rock Prison, the Assistant Commander or Platoon Leader of the Tactical Support Unit, and one of the Plaintiff's commanding officers.

19. Upon information and belief, Defendants Christobal Carrizoza and Jane Doe Carrizoza were at all times relevant to this Complaint and are currently residents of Arizona.

3

20.     At all times relevant to this Complaint, Julian Nunez was a sergeant at the Red Rock Prison, a Squad Leader on the Tactical Support Unit, and one of the Plaintiff's commanding officers.

21.     Upon information and belief, Defendants Julian Nunez and Jane Doe Nunez were at all times relevant to this Complaint and are currently residents of Arizona.

22.     At all times relevant to this Complaint, Christopher Lewis, Christobal Carrizoza, and Julian Nunez acted as sergeants and trainers for the Tactical Support Unit and within the course and scope of their employment.

23.     All individual married defendants were at all times material hereto acting on behalf of their marital community as well as themselves.

24.     Each of the defendants was the agent and/or employee or joint venturer of the other defendants and all actions by any of the defendants were in the scope and course of their employment and/or agency and/or joint venture with the other defendants and they were acting on their own behalf as well as on the behalf of all of the defendants.

25.     At all times relevant to this Complaint, Christopher Lewis, Christobal Carrizoza, and Julian Nunez were acting within the course and scope of their employment as managers and/or supervisors with CoreCivic.

26.     At all times relevant to this Complaint, Christopher Lewis, Christobal Carrizoza, and Julian Nunez were senior employees and managers and/or supervisors of CoreCivic, including at the time of the planning, the gathering of required supplies, and the execution of this training session where the shooting occurred.

## GENERAL ALLEGATIONS

27.     At all times relevant to this Complaint, CoreCivic was or should have been aware of physical abuse within the Red Rock Prison and other institutions under their control, including, but not limited to, non-adherence to internal protocols, obtaining weaponry outside of the normal process, misuse of weaponry, violence, racial animus,

4

abuse of employees, as well, as in this case, the technically prohibited practice of unnecessarily shooting firearms and chemical weapons at trainees.

28.    CoreCivic ratified such practices through inaction, express approval, or implicit approval, and fostered an environment where rules do not apply.

### The Plaintiff's Employment at the Red Rock Prison

29.    Working in corrections was Jason's dream job.

30.    Jason earned a degree in Law Enforcement/Criminal Justice from Phoenix College on a part-time basis while working in a call center to support his son.

31.    After obtaining his degree, Jason applied four times to begin his career with CoreCivic.

32.    Jason was accepted each time he applied, passed all the tests each time, but could not commence employment the first three times because the training academy schedule conflicted with his parental duties.

33.    Jason was finally able to accept employment with CoreCivic in September 2018.

34.    Jason began working as a corrections officer at the Red Rock Prison on or about September 21, 2018.

35.    Jason was hard-working and exceled in his new position.

36.    Within two months of starting at the Red Rock Prison, Jason was appointed to the Tactical Support Unit.

37.    The Tactical Support Unit is an elite group of corrections officers responsible for responding to crises inside the Red Rock Prison (*e.g.*, hostage situations, fights, riots).The training where the shooting occurred was for the Tactical Support Unit and only offered by invitation to selected CoreCivic employees to help improve their job performance at Red Rock Prison and to improve CoreCivic's ability to respond to and handle emergency situations at the prison.

5

38. All participants in the Tactical Support Unit training were CoreCivic employees working at Red Rock Prison, the training was during regular CoreCivic working hours and part of all participants' assigned job responsibilities, the training was conducted using CoreCivic equipment including CoreCivic weapons and ammunition obtained by Defendants specifically for the training.

39. The Tactical Support Unit is an elite group of corrections officers responsible for responding to crises inside the Red Rock Prison (*e.g.*, hostage situations, fights, riots).

40. CoreCivic can only act through the acts of its supervisors, managers, officers, and employees.

41. Defendants Lewis, Nunez, and Carrizoza were supervisors, managers, officers, and/or employees of CoreCivic.

42. Defendants Lewis, Nunez, and Carrizoza had full and unfettered authority over the Tactical Support Unit.

43. As such, all actions of Defendants Lewis, Nunez, and Carrizoza relevant to this lawsuit were also the acts of CoreCivic.

**CoreCivic Fostered an Abusive Culture That Allowed "Force on Force" Friendly Fire Training Exercises That Caused Employee Injuries**

44. After incidents involving live ammunition being used to fire on employees during training exercises, CoreCivic issued an Administrative Directive, April 21, 2015, that staff will no longer be exposed to Specialty Impact Munitions or direct fire from the Pepper Ball system during any training, no staff, including volunteers will be used for demonstrations.

45. Despite this Administrative Directive, CoreCivic not only permitted but continued to allow live fire "force on force" training exercises.

46. On or about June 11, 2019, in a CoreCivic training exercise in Colorado multiple employees were injured by "force on force" training. One CoreCivic employee

6

was shot with Pepper Ball type munition, one received a broken ankle from being hit by a baton, and another person received a concussion.

47.     The idea that it was acceptable within CoreCivic to shoot trainee employees like Jason was so pervasive within CoreCivic that after the shooting became known, Defendant Carrizoza, texted Jason Pearson and as part of the text stated "So *next time* we will make sure your [sic] at least with the armor provided." (Emphasis added).

**The Shooting**

48.     On or about November 23, 2018, Jason attended his first training session with the Tactical Support Unit. The training where the shooting occurred was for TSU, a special unit for Red Rock.

49.     The training where the shooting occurred was training for selected CoreCivic employees to help improve their job performance at Red Rock.

50.     All participants for this training were CoreCivic employees at Red Rock.

51.     The training where the shooting occurred was conducted by three CoreCivic supervisors, Defendants Carrizoza, Lewis, and Nunez ("Supervisors," collectively) who had total control in the planning and execution of the training without input from anyone outside of TSU.

52.     Defendants Lewis, Nunez, and Carrizoza had full and unfettered authority over the Tactical Support Unit.

53.     The three Supervisors at this TSU training where the shooting occurred were CoreCivic for all purposes and intents and times herein.

54.     The training where the shooting occurred was on CoreCivic time.

55.     The training where the shooting occurred was using CoreCivic weapons and ammo.

56.     The training where the shooting occurred was done with weapons and ammo obtained from the Red Rock armory specifically for that training.

7

57.    The training where the shooting occurred was at a place generally used for CoreCivic/Red Rock training.

58.    The training where the shooting occurred was owned by CoreCivic/Red Rock or used under an agreement with the owner and CoreCivic/ Red Rock.

59.    The training where the shooting occurred was training for CoreCivic/Red Rocks needs at the prison, improving TSUs' ability to respond and handle emergency situations at the prison.

60.    Training for TSU and similar units in other prisons is necessary to improve employee performance and increase the safety of all.

61.    CoreCivic, like all corporations, is incapable of actually doing any truly independent acts and can only do things through the acts of employees.

62.    The training where the shooting occurred was in an area without video or other surveillance equipment.

63.    At the time of the shooting, on November 23, 2018, the three Supervisors all knew that Jason Pearson was not wearing his protective equipment.

64.    At the time of the shooting, on November 23, 2018, the three Supervisors all knew that the 37mm weapon was loaded with a MuzzleBlaster.

65.    At the time of the shooting, the three Supervisors were certified by CoreCivic or the manufacturer as users of the 37mm weapon and the various rounds that could be used in it. This certification included viewing a PowerPoint training course on the 37mm weapon from the manufacturer.

66.    At the time of the shooting, the Supervisors were not certified by CoreCivic or the manufacturer as instructors for the 37mm weapon or the ammo used therein.

67.    At the time of the shooting, the Supervisors were trained that the MuzzleBlaster ammo was warned by the manufacturer that it could cause serious physical injury or death.

8

68. At the time of the shooting, the Supervisors were trained that the 37mm should not be targeted at the "red zone," areas identified by the manufacturer of the weapon on the human body including among other areas, the chest.

69. At the time of the shooting, the Supervisors were trained that shooting into the body in areas where there is little flesh over the bone (bones close to the surface of the skin), would increase the likelihood of serious injury or death.

70. At the time of the shooting, the Supervisors were trained that shooting into the center mass of the body would have the most impact but would also increase the likelihood of injury.

71. At the time of the shooting, the Supervisors were trained that they should never point the 37mm at anything they did not intend to kill.

72. At the time of the shooting, the Supervisors were instructors in the CoreCivic -Red Rock Academy for potential new employees.

73. At the time of the shooting, the Supervisors knew that the PowerPoint from the manufacturer of the 37mm weapon and ammo was part of the CoreCivic-RR Academy for new hires.

74. Just prior to the shooting, Jason Pearson and Supervisor Carrizoza were standing alone (the remainder of the group was nearby, resting on the ground) discussing the effect of the 37mm MuzzleBlaster ammo at close range.

75. Just prior to the shooting, Carrizoza turned away from Jason Pearson, walking over to talk to Lewis and Nunez.

76. Just prior to the shooting, Carrizoza returned to Jason Pearson and ordered the group to put on their gas masks and to "stack up" behind Jason Pearson in a "V" shaped formation with Jason Pearson at the point.

77. Just prior to the shooting, Jason Pearson was at the front of the "V" with Jacob Robison on his left shoulder and Ryan Shaw on his right shoulder.

9

78.    Just prior to the shooting, Lewis, not wearing a gas mask, moved away from the group.

79.    Just prior to the shooting, Nunez, wearing his gas mask, joined the trainees in the "stack," but was at the back of the "stack," well away from Jason Pearson who was on the point.

80.    Just prior to the shooting, Jason Pearson knew that he had a 37mm weapon, loaded with what he thought would be a lethal round if fired at a short distance, pointed at him from a distance of 3 feet.

81.    Just prior to the shooting, Ryan Shaw heard Carrizoza say that he was going to prove that it was safe to shoot from a close distance.

82.    Just prior to the shooting, Carrizoza, the Supervisor with the weapon, was again standing in front of Jason Pearson with the other TSU trainees behind Jason, and he asked Jason, "So if I shoot you from this distance, you believe you will die?"

83.    Just prior to the shooting, Jason Pearson said, "Yes."

84.    Carrizoza immediately pulled the trigger, discharging the weapon directly into Jason's chest from three feet.

85.    Carrizoza shot Jason Pearson to prove a point and teach Jason Pearson a lesson.

86.    Both Nunez and Lewis knew Carrizoza was going to discharge the 37mm weapon and had moved into positions of safety before the trigger was pulled.

87.    The three supervisors all admit that Jason Pearson was hit by something dispersed from the 37mm weapon.

88.    The three Supervisors all allege that any actions taken (including the shooting) would have been taken regardless of race.

89.    After the shooting, Jason was helped to his feet, given a new t-shirt because the one he was wearing had a hole in it and he was bleeding, so it had blood on it.

90.    After the shooting Lewis talked to Jason and told him, "I am your new God."

10

91.    After the shooting Jason was told, "What happens in TSU stays in TSU."

92.    Jason took this as a threat to his job.

93.    This job was Jason Pearson's dream job, but not a job, but an opening to a career he had worked for and wanted and waited to get for a long time.

94.    Jason's commanding officers told Jason that, if he left the training to seek medical attention, Jason would be fired.

95.    Jason was so intimidated that he might lose this opportunity by what Lewis had said that he did not even seek immediate medical care for fear that CoreCivic would find out and he would be fired.

96.    Jason was fearful of losing his hard-won position at the Red Rock Prison.

97.    Jason donned his ballistics vest and he remained at the prison until the training session ended.

98.    After the shooting, Jason found out that Lewis had told another supervisor (sometime before the shooting) that Jason Pearson "needed to be brought down a notch" and Nunez had called him "cocky."

99.    Alysia Hernandez later stated to a colleague that "they [*i.e.*, Christopher Lewis, Christobal Carrizoza, and Julian Nunez] all agreed to do it before he [Christobal Carrizoza] deployed it."

**Injuries**

100.    Jason Pearson was struck center mass on his chest, between and slightly below the sternum and the nipple.

101.    The 37mm MuzzleBlaster round caused severe injuries to Jason's chest, including lacerations, immediate bleeding and swelling, a deep contusion, and multiple tears in the ligaments attaching to his ribs.

102.    As a result of the shooting, Jason has a permanent scar at the impact area.

103.    Jason experienced extreme pain from the 37mm MuzzleBlaster round, and a burning sensation from the gun powder and chemicals shot onto him.

104.    Jason truly believed that he would die as a result of the blast.

105.    The doctors who ultimately examined Jason expressed amazement and opined that, if Jason had not worn the ballistics vest, maintaining pressure on the wound for the remainder of the training session, Jason likely would have died.

106.    Jason has suffered permanent injury and disfigurement directly and proximately caused by being shot at three feet by the MuzzleBlaster round.

107.    Jason suffers from post-traumatic stress disorder, which was directly and proximately caused by being shot at about three feet by the MuzzleBlaster round and the knowledge, that people he trusted, his co-workers, shot him.

108.    Because of the PTSD, Jason cannot return to work at the Red Rock Prison, cannot work in any position that requires the use of firearms or other weapons, and has great difficulty trusting anyone responsible for his safety.

109.    Jason has been traumatized by this shooting and betrayal of trust by his supervisors.

110.    Jason cannot pursue a career in his chosen profession.

111.    Jason has incurred substantial medical bills and other special and general damages as a result of the shooting in an amount to be proved at trial.

## The Coverup

112.    CoreCivic through its personnel attempted to cover up their misconduct.

113.    The shooting took place in one of the few locations that is outside the view of video surveillance equipment.

114.    Christopher Lewis told two members of the Tactical Support Unit, Armando Castillo and Stephan Park, that anyone who reported the shooting would be removed from the Tactical Support Unit.

115.    As Jason attempted to wash the chemicals off his arms shortly after the shooting, Supervisors Lewis and Nunez approached Jason.  Christopher Lewis stated to

12

Jason, "What happens in the [Tactical Support Unit] stays in the [Tactical Support Unit]. My word is like God's, around here."

116. The three Supervisors have all admitted that the statement, "What happens in TSU stays in TSU," is a common statement used in TSU circumstances.

117. Jason perceived Christopher Lewis's statement as a threat that, if Jason reported the incident, Jason would lose his job.

118. Crediting Christopher Lewis's threat, Jason did not seek medical attention until the following day.

119. Even then, based on Christopher Lewis's threat and the fear of losing his job, Jason left the healthcare facility before being medically examined.

120. Jason tendered his resignation from TSU shortly after the shooting, but before the shooting was known to the upper management at Red Rock (before Nov 30, 2018).

121. On Nov 30, 2018, one week after the shooting, when the shooting became known to Red Rock upper management, the three Supervisors thought that they were in trouble, not for the shooting itself, but for not reporting the injury to Jason Pearson, i.e. What happens in TSU stays in TSU.

122. The Supervisors were told to get written statements from all of the witnesses at the training session.

123. All of the written statements were very similar and they were mostly inconsistent with Jason's account of the shooting.

124. The Eloy Police Department began a criminal investigation into the shooting, and conducted interviews to find out what happened and who had relevant information.

125. CoreCivic also conducted an internal investigation, including interviewing at least two of the Supervisors as to what happened on Nov 23, 2018, during the training. They admitted in these interviews that the weapon was discharged at Jason at a distance of three feet.

126.    Despite these attempts to conceal their misdeeds, an internal investigation ultimately confirmed the sum and substance of the shooting as alleged by Jason Pearson then and as alleged, in more detail, herein.

127.    The three Supervisors were terminated from employment by CoreCivic following its internal investigation of the shooting.

128.    On Jan. 9, 2019, the Internal Investigation Closeout Notification, FSC Case Number 2018-12-1421, stated in correspondence to Jason that "[i]t was confirmed that the incident/situation that you reported did take place.  Appropriate action has been / will be taken to address the matter."

129.    Defendant Carrizoza was subsequently charged criminally for his role in shooting Jason.

**Intentional Acts**

130.    Defendants Lewis and Carrizoza admitted that the distance at the time of the shooting was approximately three feet from Jason Pearson.

131.    Jason was struck center mass on his chest, between and slightly below the sternum and the nipple.

132.    At the time of the shooting, on November 23, 2018, the three Supervisors all knew that Jason Pearson was not wearing his protective equipment.

133.    At the time of the shooting, on November 23, the three Supervisors all knew that the 37mm weapon was loaded with a MuzzleBlaster.

134.    At the time of the shooting, the Supervisors were aware that the manufacturer of the MuzzleBlaster warned that firing it at close range could cause serious physical injury or death.

135.    At the time of the shooting, the Supervisors were trained that the 37mm weapon should not be targeted at the "red zone," identified by the manufacturer of the weapon as the area on the human body including the chest.

14

136.    At the time of the shooting, the Supervisors were trained that shooting into the body in areas where there is little flesh over the bone (bones close to the surface of the skin) would increase the likelihood of serious injury or death.

137.    At the time of the shooting, the Supervisors were trained that shooting into the center mass of the body would have the most impact but would also increase the likelihood of injury.

138.    At the time of the shooting, the Supervisors were trained that they should never point the 37mm at anything they did not intend to kill.

139.    At the time of the shooting, the Supervisors were instructors in the CoreCivic-Red Rock Academy for potential new employees.

140.    Just prior to the shooting, Jason Pearson and Supervisor Carrizoza were standing alone (the remainder of the group was nearby, resting on the ground) discussing the effect of the 37mm MuzzleBlaster ammo at close range.

141.    Just prior to the shooting, Carrizoza turned away from Jason, walking over to talk to Lewis and Nunez.

142.    Just prior to the shooting, Carrizoza returned to Jason and ordered the group to put on their gas masks and to stack up behind Jason in a V-shaped formation with Jason Pearson at the point).

143.    Just prior to the shooting, Jason was at the front of the "V" with Jacob Robison on his left shoulder and Ryan Shaw on his right shoulder.

144.    Just prior to the shooting, Lewis, not wearing a gas mask, moved away from the group.

145.    Just prior to the shooting, Nunez, wearing his gas mask, joined the trainees in the stack, but was at the back of the stack, well away from Jason Pearson who was on the point.

146.    Just prior to the shooting, Ryan Shaw heard Carrizoza say that he was going to prove that it was safe to shoot from a close distance.

15

147.    Just prior to the shooting, Carrizoza, the Supervisor with the weapon, was again standing in front of Jason Pearson with the other TSU trainees behind Jason, and he asked Jason, "So if I shoot you from this distance, you believe you will die?"

148.    Just prior to the shooting, Jason Pearson said "Yes" and Carrizoza immediately pulled the trigger, discharging the weapon directly into Jason's chest from three feet.

149.    Defendant Carrizoza intentionally shot Jason Pearson to prove a point and teach Jason Pearson a lesson.

150.    Both Nunez and Lewis knew that Carrizoza was going to discharge the 37mm weapon and had moved into positions of safety before the trigger was pulled.

## COUNT I

## Against All Defendants

### Assault

151.    The Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

152.    Christopher Lewis, Christobal Carrizoza, and Julian Nunez intended to cause Jason Pearson harmful or offensive contact and/or apprehension of immediate harmful or offensive contact when they instructed him to stand in close proximity to the 37mm Tactical Launcher, aimed the 37mm Tactical Launcher at him and fired the 37mm Tactical Launcher at him.

153.    Christopher Lewis, Christobal Carrizoza, and Julian Nunez actually caused Jason Pearson apprehension of immediate harmful or offensive contact when they instructed Jason to stand in close proximity to the 37mm Tactical Launcher, aimed the 37mm Tactical Launcher at him, and fired the 37mm Tactical Launcher at him, hitting him in the chest.

154.    Christopher Lewis, Christobal Carrizoza, and Julian Nunez's assault of Jason Pearson actually and proximately caused severe and substantial injuries to him, including

but not limited to pain and suffering, medical expenses, loss of income, loss of consortium, PTSD, disfigurement, and hedonic damages, all in an amount to be proved at trial.

155.    Defendants Christopher Lewis, Christobal Carrizoza, and Julian Nunez are directly liable to Jason Pearson for assault.

156.    Christopher Lewis, Christobal Carrizoza, and Julian Nunez's assault of Jason Pearson was planned and carried out in the course and scope of their employment with CoreCivic as part of an official TSU training session.

157.    CoreCivic is vicariously liable to Jason Pearson for Christopher Lewis, Christobal Carrizoza, and Julian Nunez's assault of Jason under the doctrine of respondeat superior.

158.    At all times material to this Amended Complaint, Christopher Lewis, Christobal Carrizoza, and Julian Nunez were supervisors and managers who were managing, supervising, and training employees like Jason Pearson. CoreCivic acts through the actions of its supervisors and managers, and thus at all times material hereto Christopher Lewis, Christobal Carrizoza, and Julian Nunez were CoreCivic and CoreCivic was acting through them.

159.    The training exercise in which Jason Pearson was shot and injured was part of a CoreCivic work activity supervised by Christopher Lewis, Christobal Carrizoza, and Julian Nunez acting as CoreCivic using CoreCivic equipment including the weapon used to injure Jason Pearson.

160.    CoreCivic is thus directly liable to Jason Pearson for Christopher Lewis, Christobal Carrizoza, and Julian Nunez's assault of Jason.

## COUNT II

### Against All Defendants

### Battery

161.    The Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

17

162.    Christopher Lewis, Christobal Carrizoza, and Julian Nunez intended to cause Jason harmful or offensive contact and/or apprehension of immediate harmful or offensive contact when they instructed Jason Pearson to stand in close proximity to the 37mm Tactical Launcher, aimed the 37mm Tactical Launcher at him, and fired the 37mm Tactical Launcher at him.

163.    Christopher Lewis, Christobal Carrizoza, and Julian Nunez actually caused harmful or offensive contact with Jason Pearson when they instructed him to stand in close proximity to the 37mm Tactical Launcher, aimed the 37mm Tactical Launcher at him, and fired the 37mm Tactical Launcher at him, hitting him in the chest.

164.    Christopher Lewis, Christobal Carrizoza, and Julian Nunez's battery of Jason Pearson actually and proximately caused severe and substantial injuries to him, including but not limited to pain and suffering, medical expenses, loss of income, loss of consortium, PTSD, disfigurement, and hedonic damages, all in an amount to be proved at trial.

165.    Defendants Christopher Lewis, Christobal Carrizoza, and Julian Nunez are directly liable to Jason Pearson for battery.

166.    Christopher Lewis, Christobal Carrizoza, and Julian Nunez's battery of Jason Pearson was planned and/or carried out in the course and scope of their employment with CoreCivic as a part of an official TSU training session.

167.    CoreCivic is vicariously liable to Jason for Christopher Lewis, Christobal Carrizoza, and Julian Nunez's battery of Jason under the doctrine of respondeat superior.

168.    At all times material to this Amended Complaint, Christopher Lewis, Christobal Carrizoza, and Julian Nunez were supervisors and managers who were managing, supervising, and training employees like Jason Pearson. CoreCivic acts through the actions of its supervisors and managers, and thus at all times material hereto Christopher Lewis, Christobal Carrizoza, and Julian Nunez were CoreCivic and CoreCivic was acting through them.

169.    The training exercise in which Jason Pearson was shot and injured was part of a CoreCivic work activity supervised by Christopher Lewis, Christobal Carrizoza, and Julian Nunez acting as CoreCivic using CoreCivic equipment including the weapon used to injure Jason Pearson.

170.    CoreCivic is thus directly liable to Jason Pearson for Christopher Lewis, Christobal Carrizoza, and Julian Nunez's battery of Jason.

## COUNT III

### Against All Defendants

### Gross Negligence

171.    The Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

172.    Christopher Lewis, Christobal Carrizoza, Julian Nunez and CoreCivic owed to Jason Pearson a duty of care in planning, administering and overseeing firearms trainings for him and other members of the Tactical Support Unit.

173.    Christopher Lewis, Christobal Carrizoza, Julian Nunez, and CoreCivic breached a duty of care owed to Jason Pearson when they instructed him to stand in close proximity to the 37mm Tactical Launcher, aimed the 37mm Tactical Launcher at him, and fired the 37mm Tactical Launcher at him, hitting him in the chest.

174.    In instructing Jason to stand in close proximity to the 37mm Tactical Launcher, aiming the 37mm Tactical Launcher at him, and firing the 37mm Tactical Launcher at him, Christopher Lewis, Christobal Carrizoza, Julian Nunez, and CoreCivic knew or had reason to know as being certified users of the 37mm Tactical Launcher system (including knowledge of the dangerous or deadly consequences of the ammunition used in the 37mm Tactical Launcher) that their conduct created an unreasonable risk of bodily harm to Jason Pearson and a high probability that substantial harm to Jason Pearson would result.

175.    The gross negligence of Christopher Lewis, Christobal Carrizoza, Julian Nunez and CoreCivic actually and proximately caused severe and substantial injuries to

Jason Pearson, including but not limited to pain and suffering, medical expenses, loss of income, PTSD, loss of consortium, disfigurement, and hedonic damages, all in an amount to be proved at trial.

176. At all times material to this Amended Complaint, Christopher Lewis, Christobal Carrizoza, and Julian Nunez were supervisors and managers who were managing, supervising, and training employees like Jason Pearson. CoreCivic acts through the actions of its supervisors and managers, and thus at all times material hereto Christopher Lewis, Christobal Carrizoza, and Julian Nunez were CoreCivic and CoreCivic was acting through them.

177. The training exercise in which Jason Pearson was shot and injured was part of a CoreCivic work activity supervised by Christopher Lewis, Christobal Carrizoza, and Julian Nunez acting as CoreCivic using CoreCivic equipment including the weapon used to injure Jason Pearson.

178. Defendants Christopher Lewis, Christobal Carrizoza, Julian Nunez, and CoreCivic are directly liable to Jason for gross negligence.

179. Christopher Lewis, Christobal Carrizoza, and Julian Nunez's grossly negligent conduct was carried out in the Course and Scope of their employment with CoreCivic during and as part of an official training session for TSU.

180. CoreCivic is vicariously liable to Jason Pearson for Christopher Lewis, Christobal Carrizoza, and Julian Nunez's gross negligence under the doctrine of respondeat superior, as well as itself directly liable because it acted through its supervisors and managers in a grossly negligently manner, causing Jason injury.

### COUNT IV

### Against All Defendants

### Intentional Infliction of Emotional Distress

181. The Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

20

182. Christopher Lewis, Christobal Carrizoza, and Julian Nunez engaged in extreme and outrageous conduct when they instructed Jason Pearson to stand in close proximity to the 37mm Tactical Launcher, aimed the 37mm Tactical Launcher at him, and fired the 37mm Tactical Launcher at him, hitting him in the chest knowing that Jason Pearson believed that he would be killed if shot with that weapon and ammunition at the range of 3 feet.

183. In instructing Jason Pearson to stand in close proximity to the 37mm Tactical Launcher, aiming the 37mm Tactical Launcher at him, and firing the 37mm Tactical Launcher at him, hitting him in the chest, Christopher Lewis, Christobal Carrizoza, and Julian Nunez, as certified users of the 37mm Tactical Launcher system, and knowing its characteristics and potential lethality, intended to cause Jason Pearson severe emotional distress or consciously disregarded a known, substantial and unjustifiable risk that their conduct would cause Jason Pearson severe emotional distress.

184. In instructing Jason Pearson to stand in close proximity to the 37mm Tactical Launcher, aiming the 37mm Tactical Launcher at him, and/or firing the 37mm Tactical Launcher at him, hitting him in the chest, Christopher Lewis, Christobal Carrizoza, and Julian Nunez actually and proximately caused Jason  Pearson severe emotional distress, including but not limited to posttraumatic stress disorder.

185. Christopher Lewis, Christobal Carrizoza, and Julian Nunez are directly liable to Jason Pearson for intentional infliction of emotional distress.

186. Christopher Lewis, Christobal Carrizoza, and Julian Nunez's intentional infliction of emotional distress upon Jason was carried out in the course and scope of their employment with CoreCivic occurring during an official training session for the Red Rock TSU .

187. Christopher Lewis, Christobal Carrizoza, and Julian Nunez's intentional infliction of emotional distress on Jason actually and proximately caused severe and

substantial injuries to Jason Pearson, including but not limited to pain and suffering, medical expenses, loss of income, loss of consortium, PTSD, disfigurement, and hedonic damages.

188.   CoreCivic is vicariously liable to Jason for Christopher Lewis, Christobal Carrizoza, and Julian Nunez's intentional infliction of emotional distress under the doctrine of respondeat superior.

189.   At all times material to this Amended Complaint, Christopher Lewis, Christobal Carrizoza, and Julian Nunez were supervisors and managers who were managing, supervising, and training employees like Jason Pearson. CoreCivic acts through the actions of its supervisors and managers, and thus at all times material hereto Christopher Lewis, Christobal Carrizoza, and Julian Nunez were CoreCivic and CoreCivic was acting through them.

190.   The training exercise in which Jason Pearson was shot and injured was part of a CoreCivic work activity supervised by Christopher Lewis, Christobal Carrizoza, and Julian Nunez acting as CoreCivic using CoreCivic equipment including the weapon used to injure Jason Pearson.

191.   CoreCivic was in possession of, or on notice of, or knew, or should have known facts indicating that commanding officers at the Red Rock Prison, due to a culture of lawlessness, violence and disregard for the rules (force on force), might intentionally mistreat co-worker trainees like Jason Pearson .  By knowingly tolerating or endorsing or ratifying such attitudes and risks as a matter of policy, practice, and / or custom, CoreCivic acted in an extreme and outrageous manner, and consciously disregarded known, substantial and unjustifiable risks of severe physical or emotional harm to employees, including Jason Pearson.

192.   CoreCivic's extreme and outrageous conduct actually and proximately caused Jason Pearson severe emotional distress, including but not limited to posttraumatic stress disorder.

193. CoreCivic is directly liable to Jason for intentional infliction of emotional distress through the acts of its supervisors and managers, and vicariously liable for the tortious misconduct of its supervisors, managers, and/or employees as set forth herein.

## COUNT V

### Against All Defendants

### Punitive Damages

194. Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

195. When the intentional shooting Jason Pearson at close range with a lethal weapon occurred, Christopher Lewis, Christobal Carrizoza and Julian Nunez were CoreCivic supervisors and managers acting within the course and scope of their employment at CoreCivic and were conducting an official training session for the TSU at Red Rock.

196. The actions of CoreCivic and its supervisors and managers Christopher Lewis, Christobal Carrizoza, and Julian Nunez of intentionally shooting Jason Pearson in the chest with a loaded weapon from three feet away because he was "cocky" and "needed to be brought down a notch" demonstrate an evil mind and a conscious disregard for the substantial likelihood of causing Jason serious injury.

197. By empowering Christopher Lewis, Christobal Carrizoza, and Julian Nunez to exercise supervisory authority over Jason and/or by otherwise knowingly tolerating or endorsing a culture that promotes lawlessness, rule breaking, and violence, CoreCivic, through the acts of its supervisors and managers in the Course and Scope of their employment for CoreCivic during an official training session for Red Rock's TSU (a) intended to cause injury to Jason, (b) was motivated by spite or ill will against Jason, (c) acted to serve its own interests despite having reason to know and consciously disregarding a substantial risk that its conduct might significantly injure the rights of others, and/or (d)

23

consciously pursued a course of conduct knowing that it created a substantial risk of harm to others.

198.    In intentionally shooting Jason Pearson at close range with a lethal weapon during an official training session for Red Rock's TSU, Christopher Lewis, Christobal Carrizoza and Julian Nunez (a) intended to cause injury to Jason, (b) were motivated by spite or ill will against Jason, (c) acted to serve their own interests despite having reason to know and consciously disregarding a substantial risk that their conduct might significantly injure the rights of others, and/or (d) consciously pursued a course of conduct knowing that it created a substantial risk of harm to others.

199.    By empowering Christopher Lewis, Christobal Carrizoza, and Julian Nunez to exercise supervisory authority over Jason and/or by otherwise knowingly tolerating or endorsing or accepting or ratifying a culture that promotes lawlessness, violence, and rule breaking, CoreCivic engaged in practices with malice or with reckless indifference to the Arizona Constitutionally protected rights of Jason Pearson.

200.    Jason Pearson is accordingly entitled to an award of punitive damages against Defendants under applicable Arizona Law.

201.    CoreCivic is both directly liable and vicariously liable for any award of punitive damages entered against Christopher Lewis, Christobal Carrizoza, and/or Julian Nunez under the doctrine of respondeat superior and because at all times material hereto it was acting through its supervisors and managers.

## COUNT VI

### Against CoreCivic

### Vicarious Liability/Respondeat Superior

202.    The Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

203.    Christopher Lewis, Christobal Carrizoza, and Julian Nunez were at all times relevant to this lawsuit working for CoreCivic as part of their regular working duties for

24

CoreCivic and were in the scope and course of those duties at an official training session for the Red Rock TSU when the events complained of herein occurred.

204.   As such and in addition to its direct liability as set forth herein, CoreCivic is vicariously liable for the conduct and liability of Christopher Lewis, Christobal Carrizoza, and/or Julian Nunez under the doctrine of respondeat superior.

## **DEMAND FOR RELIEF**

WHEREFORE, Plaintiff Jason Pearson, demands relief in the following forms:

A.   A judgment for the Plaintiff and against each of the defendants, jointly and severally, on all claims in this Complaint;

B.   Actual damages in an amount to be proven at trial, including but not limited to damages for pain and suffering, medical expenses, loss of income, loss of consortium, PTSD, disfigurement, and hedonic damages;

C.   Punitive damages for all causes of action for which the recovery of punitive damages is authorized or provided for by law;

D.   Such other relief as the Court deems necessary, equitable, proper, and just.

E.   For such sums and for damages that qualify for a specified tier, i.e., Tier Three.

DATED this 10th day of December 10, 2020.

By   */s/ C. Lincoln Combs*
     C. Lincoln Combs
     Matthew P. MacLeod
     GALLAGHER & KENNEDY, P.A.
     2575 East Camelback Road
     Phoenix, Arizona 85016-9225
     Tel: (602) 530-8000
     Fax: (602) 530-8500
     Lincoln.combs@gknet.com

Matt.macleod@gknet.com

Adam Charles Kwasman
Joshua Edward Wagner
William Brian Blaser
WAGNER & KWASMAN PLLC
4643 N 24th St.
Phoenix, AZ 85016
Tel: (602) 698-8900
Fax: (844) 205-7471
akwasman@wagnerandkwasman.com
jwagner@wklawaz.com.com
williambblaser@gmail.com
*Attorneys for Plaintiff*